IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Kenneth G. Dean, Jr., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No.: 6:04-22798-PMD-WMC |
| v. ) | |
| ) | **ORDER** |
| Jo Anne Barnhart, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, codified at 42 U.S.C. § 405(g), to obtain judicial review of the Commissioner of Social Security's ("Commissioner") final decision, which denied Kenneth G. Dean, Jr.'s ("Dean") claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI"). The record includes a Report and Recommendation ("R&R") of the United States Magistrate Judge, made in accordance with 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02(B)(2)(a), recommending that the Commissioner's final decision be reversed and remanded for further proceedings. The Commissioner timely objected to the Magistrate Judge's recommendation. *See* 28 U.S.C. § 636(b)(1) (providing that a party may object, in writing, to a Magistrate Judge's R & R within ten days after being served with a copy).

**BACKGROUND**

**I.     Procedural History**

Plaintiff Dean filed applications for DIB and SSI on January 29, 2003, alleging disability beginning on July 1, 1999, due to seizures and high blood pressure. (Tr. at 48, 62.) His applications were denied initially and upon reconsideration. Dean requested a hearing on July 1, 2003, which

was held on November 25, 2003. (Tr. at 39, 44.) At the hearing, Dean's friend, Roland Yarborough, testified as a witness. Following the hearing, the Administrative Law Judge ("ALJ") considered the case *de novo*, and on March 26, 2004, the ALJ determined that Dean was not entitled to benefits. The Appeals Council adopted the ALJ's determination on August 27, 2004, making it the final decision of the Commissioner.

## II.     Medical Evidence

Plaintiff Dean was 44 years old at the time he alleges that his disability began and 49 years old on March 26, 2004, the date of the ALJ's decision. (Tr. 48, 229.) He has a high school education and past relevant work experience as a warehouse stocker/receiver and a painter. (Tr. at 63, 68.) He lost his job as a warehouse worker in July 1999 due to his seizures. (Tr. at 96, 253-54.) In August of 2002, he worked briefly at a wire plant, but he left the job after suffering two seizures after an 11-hour shift in extreme heat. (Tr. at 253-54.)

Plaintiff first experienced seizures involving loss of consciousness and convulsive movements as a young child, but after the age of six, he apparently did not suffer from seizures for several years. (Tr. at 142, 154.) During the late 1980s and throughout the 1990s, Plaintiff was treated periodically for gout, arthritis, fatigue, stress, mouth ulcers, indigestion, hypertension, chest pain, high blood sugar, and cholesterol. (Tr. at 103-12, 150.) Medical records noting the date of his first adult seizure are inconsistent. One clinical record indicates that he suffered his first adult seizure some time around 1977; other records indicate that it did not occur until June of 1991, and that he had another seizure some time in 1992. (Tr. at 142-43, 148, 150.)

In November of 1997, Plaintiff had a seizure and was admitted to the hospital, via the emergency room. (Tr. at 141-43.) Plaintiff next sought medical treatment for a claimed seizure in

February of 1998. (Tr. at 106.) Subsequently, he reported having one seizure in September of 1998, one in November or December of 1998, and one in January of 1999. (Tr. at 103-104, 168.) With the exception of one EEG in 1991 which showed mild generalized slowing, all diagnostic studies were normal. (Tr. at 144-45, 147, 150, 152-53, 162.) As of January of 1999, he had no significant neurological symptoms or decline. (Tr. at 176.) Plaintiff was treated with various anti-seizure medications, and his physicians restricted him from driving, working at heights or around dangerous machinery, swimming, and bathing in a bathtub. (Tr. at 143, 177.)

According to Plaintiff's seizure diary, which was submitted to the Appeals Council following the ALJ's decision, Plaintiff suffered from a seizure in June of 1999, one in July of 1999, and one in September of 1999. (Tr. at 167-168.) It is unclear whether he received medical attention for these seizures. On November 17, 1999, Plaintiff saw his physician, Dr. Eric Moore, for a general follow-up visit. Interestingly, contrary to his seizure diary, Plaintiff reported to Dr. Moore that he had been seizure-free since January of 1999, a period of 11 months. (Tr. at 102.) Plaintiff indicated that he had been driving since June and that he had not experienced difficulties. (Tr. at 102.) Dr. Moore assessed an "apparently stable" seizure disorder and renewed Plaintiff's anti-seizure medication, Dilantin. (Tr. at 102.) In his seizure diary, Plaintiff indicated that he had a seizure in February of 2000, one in March of 2000, and one in June of 2000. (Tr. at 167.)

Plaintiff returned to Dr. Moore on June 14, 2000, and indicated that he was seeing neurologist Dr. Thomas S. Hughes, who discontinued Plaintiff's Dilantin and prescribed Trileptal for Plaintiff's seizures. (Tr. at 102.) On August 24, 2000, Plaintiff visited Dr. Hughes and reported having had only one seizure since his last visit. (Tr. at 169.) Plaintiff next saw Dr. Moore on January 17, 2001, at which time he denied any acute complaints but reported some breakthrough

3

seizure activity. Plaintiff indicated that he no longer saw Dr. Hughes, but that he continued to take Trileptal. Plaintiff also reported that he stopped taking his blood pressure medication because his blood pressure came down. Dr. Moore noted that Plaintiff had no interest in starting the blood pressure medication again because he attributed his hypertension to stress. With regard to Plaintiff's decision not to take his blood pressure medication, Dr. Moore stated that he would continue to "gently urge him to allow us to bring this under control." (Tr. at 101.)

At a follow-up visit on February 14, 2001, Plaintiff reported having had a seizure about two weeks earlier. Dr. Moore referred Plaintiff to neurologist Dr. Mark Grinman. (Tr. at 101.) Plaintiff saw Dr. Grinman on March 12, 2001, at which time Plaintiff told Dr. Grinman that he began having seizures in January of 1999. On examination, Plaintiff was fully oriented, had intact memory, attention, and concentration. He had full motor strength, intact sensation, and normal reflexes, gait, and coordination. A subsequent EEG was normal. (Tr. at 133, 198-99.)

On May 14, 2001, at a follow-up visit with Dr. Grinman, Plaintiff reported having had five seizures.[1] Dr. Grinman noted that all of Plaintiff's seizures had different clinical presentations so it was unclear whether he was having epileptic or non-epileptic episodes. Dr. Grinman switched Plaintiff to Tegretol. (Tr. at 196-97.) At a subsequent visit in June of 2001, Plaintiff reported that he had only one episode of seizures shortly after switching to the new medication, but that then his seizures completely stopped. Dr. Grinman began treating Plaintiff's elevated blood pressure with Norvasc. (Tr. at 194.) One week later, Plaintiff again reported to Dr. Grinman for a follow-up visit. Plaintiff stated that he had no recurrence of his seizures. Dr. Grinman increased Plaintiff's Norvasc

---

[1] Plaintiff's seizure diary indicates that he had one seizure in March of 2001, one in April of 2001, and one in May of 2001.

4

dose. (Tr. at 192-93.) At subsequent visits in July and November of 2001, Plaintiff reported that he was doing well and had no recurrence of his seizures.[2] (Tr. at 188-91.) Dr. Grinman characterized Plaintiff's seizure disorder as "stable" and "under good control" and noted that Plaintiff was "doing really well." (Tr. at 188, 190.) Dr. Grinman allowed Plaintiff to resume driving in November of 2001. (Tr. at 189.)

On August 5, 2002, Plaintiff returned to Dr. Grinman and reported that he had been doing great on low-dose Tegretol and that he had been seizure-free for more than a year until the previous week, when he suffered a seizure after working at a new job in extreme heat for 11 hours. Plaintiff also stated that when he returned to work, he had another seizure. Dr. Grinman assessed breakthrough seizures probably provoked by heat and exhaustion at work. He discussed "the necessity to avoid provoking situations such as sleep depr[i]vation, exhaustion, heat, dehydration, etc.," and he adjusted Plaintiff's Norvasc and Tegretol doses and instructed Plaintiff not to drive for six months. (Tr. at 186-87.) On August 14, 2002, at a follow-up visit, Dr. Grinman indicated that Plaintiff's Tegretol dose was submaximal, increased the dose, and again instructed Plaintiff to "avoid provoking situations such as sleep deprivation, exhaustion, heat, dehydration, etc." (Tr. at 184-85.) At another follow-up visit on September 18, 2002, Plaintiff reported that he was doing well but was having trouble finding employment. (Tr. at 182.)

According to Plaintiff's seizure diary, he suffered a seizure on September 11, 2002, one in October of 2002, and one on December 14, 2002. (Tr. at 164-67.) However, on December 18, 2002, at a follow-up visit with Dr. Grinman, Plaintiff reported that he had not had a seizure since August

---

[2] However, in his seizure diary, Plaintiff recorded that he had suffered one seizure on November 14, 2001, five days prior to the November 21, 2001, visit to Dr. Grinman.

5

of 2002. Dr. Grinman noted that Plaintiff was doing well and increased his Norvasc dose. (Tr. at 180-81.)

On February 21, 2003, state agency physician Dr. F. K. Baker reviewed Plaintiff's records and completed a "Residual Functional Capacity Assessment" form. Dr. Baker concluded that Plaintiff had no exertional limitations but could not climb ladders, ropes, or scaffolds, and could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl. He also found that Plaintiff needed to avoid all exposure to hazards. (Tr. at 201-08.) A second assessment, completed in June of 2003, reported the same conclusions except that it did not include any limitations on climbing ramps or stairs, balancing, stooping, kneeling, crouching, or crawling. (Tr. at 219-26.)

In Plaintiff's seizure diary, he states that he suffered a seizure in March of 2003 and two in April of 2003. On April 23, 2003, Plaintiff was admitted to Georgetown Memorial Hospital following a "generalized tonic clonic seizure" which came on without warning and lasted for one or two minutes; Plaintiff told his physicians that it left him with paresis, or localized weakness, in his left leg. Dr. Grinman performed a consultation with Plaintiff and assessed a breakthrough seizure with some residual left leg weakness. He adjusted Plaintiff's medications, and upon discharge on April 25, 2003, Plaintiff reported that he had complete resolution of the paresis. (Tr. at 114-29.)

On June 16, 2003, Plaintiff returned to Dr. Grinman and reported that his left-side weakness had "significantly improved" and denied having that symptom anymore. Dr. Grinman noted that Plaintiff was "doing well." (Tr. at 179.)

At the hearing, Plaintiff testified that he continued to have seizures despite taking Tegretol. (Tr. at 256.) He testified that his first seizure was in November of 1998 and that he continued to

work in a warehouse but had to stop working due to his inability to drive. (Tr. at 257.) Plaintiff stated that he still had numbness in his left arm and walked with a limp. (Tr. at 258-59.) He said he thought his seizures were caused by stress and that his seizures made him fearful. (Tr. at 261.)

Plaintiff's friend, Roland Yarborough, also testified at the hearing that he saw Plaintiff every week and that he had witnessed Plaintiff's seizures. (Tr. at 264-65.) Yarborough stated that Plaintiff typically became nervous and uncoordinated and that Plaintiff's mind rambled after a seizure. (Tr. at 264-65.)

In a "daily Activities Questionnaire" completed on April 23, 2003, Plaintiff indicated that he could care for his personal needs, but that he had difficulty preparing meals and doing any housework. (Tr. at 94.) In a "Lay Evidence" form completed on May 30, 2003, by a claims examiner, Plaintiff reported that he had memory difficulties, but that during the day, he "clean[ed] around the house;" did some yard work such as raking; helped others with odd jobs such as yard work or moving furniture; read for 45 minutes at a time without any difficulty; and watched television without any trouble remembering the shows. (Tr. at 213.) Plaintiff reported that he had not received any mental health treatment. (Tr. at 213.)

## DISCUSSION

### I.     Magistrate Judge's R & R

The Magistrate Judge makes only a recommendation to the court. The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the court. *Mathews v. Weber*, 423 U.S. 261, 269 (1976). The court reviews *de novo* those portions of the R&R to which specific objection is made, and the court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge, or recommit the matter to the Magistrate

Judge with instructions. 28 U.S.C. § 636(b)(1). The court has reviewed the entire record, including the R&R and the Commissioner's objections. Pursuant to this review, the court concludes that the Magistrate Judge accurately detailed the facts at issue and applied the correct principles of law. Accordingly, the court adopts the R&R and incorporates it to the extent it is not inconsistent with this Order.

## II.     Standard of Review

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides, "[t]he findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Consequently, judicial review . . . of a final decision regarding disability benefits is limited to determining whether the findings are supported by substantial evidence and whether the correct law was applied." *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). The phrase "substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

*Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). In assessing whether there is substantial evidence, the reviewing court should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency. *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original).

## III.    Commissioner's Final Decision

The Commissioner is charged with determining the existence of a disability. The Social

Security Act, 42 U.S.C. §§ 301-1399, defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A). This determination involves the following five-step inquiry:

> [The first step is] whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App.I. If so, the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work.

*Mastro*, 270 F.3d at 177 (citing 20 C.F.R. § 416.920).

If the claimant fails to establish any of the first four steps, review does not proceed to the next step. *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1993). The burden of production and proof remains with the claimant through the fourth step. However, if the claimant successfully reaches step five, then the burden shifts to the Commissioner to provide evidence of a significant number of jobs in the national economy that a claimant could perform, considering the claimant's medical condition, functional limitations, age, education, and work experience. *See Walls*, 296 F.3d at 290.

Applying this framework, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. at 22, Finding 2.) Second, the ALJ found that Plaintiff's seizures and high blood pressure are considered severe based on the requirements in the

regulations. *See* 20 C.F.R. §§ 404.1520(c) and 419.920 (b). (Tr. at 22, Finding 3.) Third, the ALJ found that "[t]hese medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4." (Tr. at 22, Finding 4.) Fourth, the ALJ found that Plaintiff was unable to return to any of his past relevant work. (Tr. at 22, Finding 7.) Fifth, the ALJ found that Plaintiff "has the residual functional capacity to perform substantially all of the full range of medium work."[3] (Tr. at 23, Finding 11.) Accordingly, the ALJ found that Plaintiff was not under a "disability" as defined in the Social Security Act.

## IV. Analysis

In his Complaint, Plaintiff asserts that the ALJ erred by: (1) failing to give specific reasons in support of her finding that the testimony of Plaintiff and Yarborough was less than fully credible; (2) failing to include significant exertional limitations in her finding of residual functional capacity ("RFC"); (3) failing to meet her burden of proof by not obtaining vocational expert testimony to determine whether Plaintiff could perform other jobs existing in significant numbers; and (4) failing to determine mental RFC.

Upon a review of the record and in response to Plaintiff's assertions, the Magistrate Judge concluded that it was impossible for the court to determine whether the ALJ properly evaluated Plaintiff's and Yarborough's credibility because she did not cite the evidence relied upon in making her credibility determination or the reasons for her decision. Consequently, the Magistrate Judge recommended remand for a proper credibility determination. Second, the Magistrate Judge found that the ALJ erred in failing to include all of Plaintiff's significant nonexertional limitations in the

---

[3] In Plaintiff's Brief, he states that "no argument exists as to steps one, two, three, and four of this sequential evaluation process." (Pl. Brief at 3.)

finding of RFC – specifically, Plaintiff's need to avoid provoking situations such as sleep deprivation, exhaustion, heat, and dehydration. In response to Plaintiff's third argument, the Magistrate Judge found that the ALJ did not err by failing to obtain testimony from a vocational expert ("VE"). Finally, the Magistrate Judge concluded that the ALJ was not required to conduct a mental RFC assessment because no mental deficits were noted in the medical records and because none of Plaintiff's physicians ever restricted him due to mental deficits.

### 1.     The ALJ's Credibility Determination

In response to the R&R, "the Commissioner respectfully asks that the court not adopt the [R&R], but instead find that substantial evidence supports the Commissioner's final decision and accordingly affirm that decision." (Def. Response at 1.) With regard to the Magistrate Judge's conclusion that the ALJ failed to cite evidence and give reasons in support of her credibility determination, Defendant states:

> The Commissioner acknowledges that the credibility determination does not set forth the various inconsistencies in the record as a discreet subsection of the decision. However, the Commissioner submits that in the present case this should not be determinative of the outcome, since the ALJ specifically considered the medical and non-medical evidence throughout the record, and the credibility determination was supported by substantial evidence.
>
> . . .
>
> Thus, while the ALJ's credibility determination may not have been the ideal, this arguable deficiency in [her] opinion-writing technique is not fatal in this case because the credibility determination is ultimately supported by substantial evidence.

(Def. Response at 1-2.) Unfortunately for Defendant, however, Social Security Ruling 96-7p emphasizes the importance of "explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision." SSR 96-7p, 1996 WL 374186 at *1. The Ruling states:

11

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *2; *see also Hammond v. Heckler,* 765 F.2d 424, 426 (4th Cir. 1985) (stating that credibility determinations "should refer specifically to the evidence informing the ALJ's conclusion"); *Hatcher v. Secretary,* 898 F.2d 21, 23 (4th Cir. 1989) (quoting *Hammond*).

Here, in making her credibility determination, the ALJ simply stated: "The undersigned finds the claimant's allegations regarding his limitations are not totally credible in light of the evidence of record when considered in its entirety." (Tr. at 22, Finding 5.) As the Magistrate Judge noted, the ALJ did not cite any specific evidence relied upon in assessing Plaintiff's and Yarborough's credibility. Nor did the ALJ provide any specific reasons for finding the allegations not totally credible. Therefore, the court concludes that the ALJ's determination is not sufficiently specific. Accordingly, the court cannot determine whether substantial evidence supports the ALJ's determination, and thus, the court must remand the case for the ALJ to make a sufficiently specific credibility determination.[4] *See also Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original) (stating that in assessing whether there is substantial evidence, the reviewing court

---

[4] In the response to the R&R, the Commissioner objects, "it appears that the Magistrate Judge has inappropriately reweighed the evidence in this case, thereby exceeding the scope of judicial review permitted by 42 U.S.C. § 405(g). (Def. Response at 4.) (citing *Huston v. Bowen*, 838 F.2d 1125, 1127 (10 th Cir. 1988), where the Tenth Circuit Court of Appeals found that "the district court usurped the function of the ALJ by reweighing the evidence and making, in effect, its own credibility determination"). However, what the Commissioner fails to understand is that the Magistrate Judge (and this court) must remand the case so as *to avoid* inappropriately reweighing the evidence.

should not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency).

### 2. The ALJ's Finding of Residual Functional Capacity

Second, with regard to the ALJ's RFC assessment,[5] Plaintiff notes that on both August 14 and August 26 of 2002, his treating physician, Dr. Grinman, instructed Plaintiff "to avoid provoking situations such as sleep deprivation, exhaustion, heat, dehydration, etc." (Tr. at 185,187.) Thus, Plaintiff claims that the ALJ erred by failing to include these nonexertional limitations in her finding of RFC. Additionally, Plaintiff claims that the ALJ erred by failing to include other nonexertional limitations such as inability to cope with stress and problems with anxiety and concentration.

In response to the R&R, however, Defendant claims that the ALJ was not required to incorporate the additional restrictions on exposure to heat, exhaustion, sleep deprivation, and dehydration into the RFC assessment because these additional restrictions "were based on a one-time event in which Plaintiff had two seizures purportedly following an 11-hour shift in extreme heat." (Def. Response at 3.) (Def. Response at 3.) Moreover, Defendant claims that even if the ALJ had incorporated those restrictions into the RFC, they would not have significantly impacted the "very broad occupational base at issue in this case, that is, the 2,5000 medium, light and sedentary occupations." (Def. Response at 3.) Additionally, Defendant claims that the ALJ was correct in not

---

[5] Residual functional capacity is what the claimant is able to do despite his or her limitations. *See* 20 C.F.R. § 404.1545. Here, the ALJ found as follows:

> The undersigned finds the claimant retains the following residual functional capacity: lift up to 50 pounds occasionally and 25 pounds frequently and stand/walk up to six hours in an eight hour work day. The claimant should avoid unprotected heights, dangerous, heavy machinery and operating a vehicle or forklift.

(Tr. at 20, 22.)

13

including Plaintiff's allegations of limitations due to stress, anxiety, and concentration because there was no medical basis whatsoever for these allegations and because no physician ever restricted Plaintiff due to these alleged deficiencies. (Def. Memo. at 21.)

In light of treating physician Dr. Grinman's instructions to Plaintiff, the court concludes that the ALJ should have included the additional restrictions on exposure to heat, exhaustion, sleep deprivation, and dehydration into the RFC assessment, or at the very least, the ALJ should have articulated her reasons for discounting these additional restrictions.[6] *See*, *e.g.*, 20 C.F.R. § 404.1527(d)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Thus, on remand, the Commissioner is directed either to consider the effect of these additional nonexertional limitations on Plaintiff's capacity for medium work, or to provide sufficient reasons for failing to consider these additional limitations.

In contrast, the court does not find error in the ALJ's failure to include restrictions related to stress, anxiety, concentration, and memory in her RFC assessment because the medical records

---

[6] The court also agrees with the Magistrate Judge that the ALJ did not err in failing to obtain testimony from a vocational expert. In the R&R, the Magistrate Judge states:

> As discussed above, the court finds that the ALJ should have also included the nonexertional limitations of avoiding sleep deprivation, exhaustion, heat, and dehydration. The plaintiff does not argue that these limitations erode the occupational base to the extent that vocational expert testimony was required. This court agrees and finds that the ALJ was not in error in failing to obtain testimony from a vocational expert.

(R&R at 15.); *see also Walker v. Bowen*, 889 F.2d 47, 48 (4th Cir. 1989) ("We recognize that not every nonexertional limitation or malady rises to the level of a nonexertional impairment, so as to preclude reliance on the grids.").

contain no reference to these alleged mental difficulties. Moreover, none of Plaintiff's physicians ever placed restrictions on him due to these alleged mental difficulties. Thus, with respect to Plaintiff's alleged mental deficiencies, the court concludes that the ALJ was not required to include them in her RFC assessment.[7]

## CONCLUSION

After a careful examination of the record as a whole, the court cannot conclude that the ALJ's decision to deny benefits was supported by substantial evidence due to deficiencies in the ALJ's report. It is, therefore, **ORDERED**, for the foregoing reasons, that the Commissioner's denial of benefits is **REVERSED**, and the matter is **REMANDED** for the Commissioner to take appropriate action regarding an award of benefits to Plaintiff Dean.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**Charleston, South Carolina**
**February 6, 2006**

---

[7] Additionally, as the R&R concludes, the ALJ was not required to conduct a mental RFC assessment due to the lack of medical evidence of any medically determinable mental impairment and the lack of treatment for mental disorders. Likewise, the court concludes that Plaintiff's argument that these alleged mental deficiencies constitute nonexertional limitations requiring the ALJ to obtain testimony from a vocational expert is without merit.